No. 86-217

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

DARRELL GIERKE,

        Claimant and Appellant,

    -vs-

BILLINGS GAZETTE, Employer

    and

ASSOCIATED INDEMNITY CORPORATION,

        Defendant and Respondent.

_____

APPEAL FROM:  The Workers' Compensation Court, The Honorable
Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Lynaugh, Fitzgerald, Hingle & Eiselein; Thomas J.
Lynaugh, Billings, Montana

    For Respondent:

        Neil S. Keefer, Billings, Montana

_____

Submitted on Briefs:  Aug. 21, 1986

Decided:  December 30, 1986

Filed: DEC 30 1986

_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Gierke appeals from a March 6, 1986, decision of the Workers' Compensation Court which denied Gierke's claim for additional disability benefits. We affirm.

Gierke raises four issues for our review:

1. Did substantial evidence support the court's decision that Gierke is not entitled to additional benefits?

2. Did the court fail to consider Gierke's pain, age, education and work experience?

3. Did the court err when it characterized Gierke's retirement as voluntary?

4. Did the court err when it placed the burden on Gierke to prove that he had no reasonable prospect of employment in the normal labor market?

On August 17, 1983, Gierke injured his right shoulder when he tripped while pulling a park bench off a street in Worland, Wyoming. All parties agree that Gierke was injured within the scope and course of his employment with the Billings Gazette. Gierke's orthopedic surgeon, Dr. James Scott, diagnosed Gierke as having a rotator cuff tear to his right shoulder.

At the time of the injury, Gierke was fifty-six years old. He had been employed at the Billings Gazette for eighteen years. Before his injury and thereafter, he worked as county circulation and transportation manager. His duties consisted primarily of supervising four district managers in eastern Montana. These duties required Gierke to drive several hundred miles per week. Gierke testified that he spent 80 percent of his time on the road. On occasion, he also performed physical work, such as stacking papers.

Gierke worked full-time from the date of his injury until the first operation on his right shoulder on January 16, 1984. Dr. Scott performed the operation.

Dr. Scott operated again on Gierke's shoulder on February 6, 1984. Associated Indemnity accepted liability and paid Gierke temporary total disability benefits for January 16 and 17 and February 6 through 12, 1984. On September 16, 1985, Associated Indemnity also paid Gierke $13,850 for one hundred weeks of permanent partial disability. The payment was based upon Dr. Scott's 35 percent impairment rating of Gierke's upper extremity, which converted to a 20 percent impairment of the whole man.

In April, 1985, the Gazette offered a voluntary early retirement program to all of its 175 employees. Eighteen employees accepted the early retirement, including Gierke. Gierke's effective date of retirement was April 17, 1985, when he received a lump-sum separation payment of $12,180. Four months later, Gierke filed a petition to increase his disability benefits.

Issue 1

Does substantial evidence support the court's decision that Gierke is not entitled to additional disability benefits?

Judge Reardon of the Workers' Compensation Court heard the testimony and observed the demeanor of all witnesses at trial. He reviewed all pleadings, exhibits and depositions. Judge Reardon concluded that the evidence failed to establish a causal relationship between the industrial accident and Gierke's current complaints about his left shoulder pain.

On appeal, Gierke first contends that he was permanently totally disabled as a result of the injury to his right shoulder, which he claims has now spread to his left shoulder. Section 39-71-116(13), MCA, defines permanent total disability as:

> . . . a condition resulting from injury as defined in this chapter that results in the loss of actual earnings or earning capability that exists after the injured worker is as far restored as the permanent character of the injuries will permit and which results in the worker having no reasonable prospect of finding regular employment of any kind in the normal labor market. Disability shall be supported by a preponderance of medical evidence.

Gierke's contention that he is permanently totally disabled is disputed by his own testimony, where Gierke discussed his plans to continue working:

> Q. What did you plan to do at the time you retired, if anything?
>
> A. I had no plans other than certainly the necessity to find employment, or to be employed some way some time. You know, I always enjoyed working. I have no intentions of discontinuing work.

Gierke elaborated on these employment plans later in his testimony:

> Q. What type of work do you feel you could do? I mean, all things considered, your training, experience.
>
> A. My training and experience, I think the strong suit would be sales of some nature.

As further evidence of his ability to work, both Gierke and his Gazette supervisor testified that Gierke asked the Gazette for an "independent-haul contract" on the day of his retirement. Under this independent contract, Gierke would load bundles of newspapers at the Gazette each night and deliver them to selected drop points.

4

We also note that in December, 1984, Gierke was adequately performing his job, according to a job performance review by his supervisor. Gierke supported the review with his own testimony: "I felt that I was still in the same category of exceeding job standards."

Furthermore, Gierke has consulted two doctors, Dr. Scott and Dr. Gary Ray, an osteopath. Both doctors testified that Gierke can do just about any type of work, as long as he avoids certain motions with his right shoulder on a prolonged basis.

Dr. Scott testified:

> Q. Basically, Doctor, so far as the right shoulder is concerned, he should avoid an activity where he has to have the right arm above the head, or the right arm working straight out?
>
> A. Yes.
>
> Q. And, other than that, he can do about anything that he would be capable of doing?
>
> A. That is a generous statement, but generally I would agree.

Dr. Ray testified:

> Q. Now, Doctor, let's get on the positive side of things a little bit. What can Mr. Gierke do, I would like your comments on that, I mean so far as day-to-day physical activities that would relate to work and the job market.
>
> A. The simple way of answering that would be to do everything that I have not mentioned, and, in fact, that is, there is an awful lot of things that can be done. If I had these two conditions, I would want an inside job, to begin with. And, of course, that gives us about eighty percent of the jobs available in Yellowstone County would be indoors. The limitations of the arm would be really very minor in terms of what things that you could not do . . . But any sort of desk work, any sort of sales work that did not require overhead work would be fine.

The Workers' Compensation Court properly concluded that Gierke was not permanently totally disabled as a result of his industrial accident. The conclusion was based on Dr. Scott's medical evidence that Gierke had reached maximum recovery and that his symptoms were chronic. The conclusion also noted that both Gierke's supervisor and Gierke himself testified that Gierke satisfactorily performed his employment duties from the date of his industrial injury until his retirement twenty months later.

In the alternative, Gierke contends that he is permanently partially disabled. Section 39-71-116(12), MCA, defines permanent partial disability as:

> . . . a condition resulting from injury as defined in this chapter that results in the actual loss of earnings or earning capability less than total that exists after the injured worker is as far restored as the permanent character of the injuries will permit. Disability shall be supported by a preponderance of medical evidence.

Gierke has failed to meet the statute's "preponderance of medical evidence" test. From the date of his injury to the date of his retirement, Gierke never reported any pain to his Gazette supervisor. Furthermore, Gierke did not tell Dr. Scott about his left shoulder pain until August, 1984, a year after the original injury to his right shoulder. Gierke's pain claim is also disputed by Dr. Scott. In both a letter to Gierke and in his deposition, Dr. Scott concluded that the left shoulder pain was unrelated to Gierke's industrial injury:

> Q. Now, Doctor, I believe you state on page four, which would be the January 21st letter, that you don't see any connection between his left shoulder -- left neck pain and the accident that he had in August of '83, when he dislocated his right shoulder, is that correct?

A. Yes, sir.

Q. And that would be your opinion, that the two were unrelated?

A. Yes, sir.

Q. Now is this consistent, Doctor, with his lack of reporting pain anywhere else for six or eight months, well, a year really, after the dislocation in August, of 1983?

A. Yes.

Q. And this is still your opinion as of today?

A. Yes, it is.

Dr. Scott also testified that Gierke's new pain in both shoulders is distinct from the pain resulting from Gierke's industrial injury:

Q. Now, prior to his hospitalization, his pain was in his right shoulder, and it came from the rotator cuff tear, I take it.

A. Yes, sir.

Q. And the pain that we are talking about on January 8th, of 1985, nearly a year later, is different, and it is in both shoulders?

A. Well, yes sir.

Q. And at this point at least you still don't have it diagnosed?

A. No, sir.

In reviewing Gierke's case, the substantial evidence test was defined in Steffes v. 93 Leasing Co., Inc. (1978), 177 Mont. 83, 86-87, 580 P.2d 450, 452-453. We held:

Our function in reviewing a decision of the Workers' Compensation Court is to determine whether there is substantial evidence to support the findings and conclusions of that court. We cannot substitute our judgment for that of the trial court as to the weight of the evidence on questions of fact. Where there is substantial evidence to support the findings of the Workers' Compensa-

7

tion Court, this Court cannot overturn that decision.

Gierke failed to establish a causal connection between his right shoulder injury and his new pain in both shoulders. Gierke failed to support his claim that he is additionally disabled by his right shoulder injury. On the contrary, the abundance of evidence from Gierke's doctor and from Gierke himself indicates that his right shoulder is not greatly disabling. Gierke testified that he wants to work, and both doctors testified that he is able to work.

In view of such substantial evidence, and applying the Steffes test, we hold that the evidence fully supports the decision of the Workers' Compensation Court.

## Issue No. 2

Did the court fail to consider Gierke's pain, age, education and work experience?

Gierke contends that the Workers' Compensation Court ignored testimony by Gierke, Gierke's wife and Gierke's co-worker about his pain and insomnia. Gierke also claims that the court failed to consider Gierke's age, education and work experience.

We find no merit in Gierke's contentions. In its Findings of Fact, the Workers' Compensation Court specifically notes Gierke's age and education under a section entitled "Claimant":

> 2. Claimant was born on January 2, 1927. At the time of the hearing, he was 58 years of age.
>
> 3. He is married and has one minor child living at home.
>
> 4. Claimant did not complete high school.

8

The Workers' Compensation Court further discusses Gierke's work experience in a section entitled "Claimant's Employment With The Gazette":

> 5. Claimant went to work for the Billings Gazette in January, 1967. After a series of promotions, he became the County Circulation and Transportation Manager for the Gazette. His job entailed supervising four district managers and all independent-haul contracts. Claimant testified that his job included many different duties, including hauling papers from the Gazette to the delivery area if the responsible contractor was unable to do so.

In its Conclusions of Law, the Workers' Compensation Court refers to Gierke's overall condition, including his new pain:

> Both Dr. Scott and Dr. Ray testified as to the types of work claimant can do and which types he should avoid. This testimony takes into account claimant's overall physical condition, including any and all pains not related to the industrial injury of August 17, 1983. Even so, both doctors testified that claimant can do just about any type of work, so long as he avoids certain motions with his right shoulder on a prolonged basis.
>
> In sum, the right shoulder, standing alone, is not greatly disabling. Even when other factors are considered, there is a great deal that claimant can do.

Gierke's assertion that the court failed to consider all factors is directly rebutted by the evidence and the well-written decision of the Workers' Compensation Court. The court carefully considered all factors and fully supported its conclusions. Gierke's contention on this issue has no merit.


Issue No. 3

Did the court err when it characterized Gierke's retirement as voluntary?

9

Gierke argues that his retirement was not voluntary because the _Gazette_ created and offered the plan to its employees, rather than the plan being inspired by Gierke himself. Gierke further contends that the plan was not voluntary because the _Gazette_ encouraged the plan and thus exerted subtle pressure. In his brief, Gierke omits any mention of the $12,180 lump-sum payment he received in consideration for his early retirement.

The _Gazette_ contends that Gierke retired of his own free will and that his job did not seriously aggravate the pain in his shoulder. As we discussed in the first issue, Gierke's injury did not prevent him from performing his job at the _Gazette_. The Workers' Compensation Court denied permanent disability benefits to Gierke because he could have continued to work for the _Gazette_ if he had not voluntarily retired. As the court stated: "He was adequately performing his duties and was under no threat of being fired when he elected to take an early retirement." Both Dr. Scott and Dr. Ray concluded that Gierke could continue to drive his company pick-up truck, which was equipped with power options, air conditioning and tilt-wheel steering.

Although Gierke contends that the _Gazette_ forced him to retire, his contention is directly rebutted by his own testimony:

> Q. Now, I am going to ask you this, Mr. Gierke: Were you fired by the Gazette, or did you quit?
>
> A. I don't feel I was fired. Definitely not.

Later in his testimony, Gierke stated:

> Q. Okay. Did Michel or anyone else ever say, "Darrell, either you retire or we're going to fire you?"

10

A. No, sir, they did not.

Gierke alleges that his retirement was made under duress. However, the voluntary retirement program was offered to every Gazette worker, with no special focus on Gierke. The Workers' Compensation Court properly concluded, based upon testimony by Gierke and his Gazette supervisor, that Gierke voluntarily retired. In consideration for his retirement, he received the $12,180 payment.

We affirm the Workers' Compensation Court's judgment. Gierke's retirement was not related to any failure in his job performance. His retirement was voluntary and uncoerced.

Issue No. 4

Did the court err when it placed the burden on Gierke to prove that he has no reasonable prospect of employment in the normal labor market?

In the six months following his retirement on April 17, 1985, until the compensation hearing on October 29, 1985, Gierke never looked for a job. He testified:

> Q. Now, have you worked at all since you left the Gazette?
>
> A. No, sir, I have not.
>
> Q. Have you registered at the employment office?
>
> A. No, sir, I have not.

In its decision, the Workers' Compensation Court outlined the burden of proof on Gierke, citing Metzger v. Chemetron Corp. (Mont. 1984), 687 P.2d 1033, 1035, 41 St.Rep. 1788, 1790: "To establish the existence of no reasonable prospect of employment in the normal labor market, a claimant must introduce substantial credible evidence of (1) what jobs constitute his normal labor market, and (2) a complete

11

inability to perform the employment duties associated with those jobs because of his work-related injury." Gierke failed to introduce such substantial credible evidence.

On the contrary, Gierke voluntarily retired from one segment of his normal labor market and then failed to look for work in the remainder. As we have repeatedly held, the general rule is that the claimant bears the burden of establishing a right to compensation. Dumont v. Wickens Bros. Const. Co. (1979), 183 Mont. 190, 201, 598 P.2d 1099, 1105. Gierke repeatedly testified about his desire to work. Both doctors testified about his ability to work. When such evidence is combined with Gierke's failure to seek employment, Gierke's claim of "no reasonable prospect of employment" is without merit.

We affirm the judgment of the Workers' Compensation Court on all issues.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

12